# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2018-CA-01225-SCT

*MARIA E. THOMPSON*

*v.*

*DENNIS L. HOLLIMAN AND ALLSTATE*
*PROPERTY AND CASUALTY INSURANCE*
*COMPANY*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/27/2018 |
| TRIAL JUDGE: | HON. LAWRENCE PAUL BOURGEOIS, JR. |
| TRIAL COURT ATTORNEYS: | SUSAN CHRISTINA DEHGHANI-SANICH |
| | MICHAEL SCOTT BISHOP |
| | ROBERT W. ATKINSON |
| | ROBERT ELLIOTT BRIGGS, III |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | MICHAEL SCOTT BISHOP |
| | SUSAN CHRISTINA DEHGHANI-SANICH |
| ATTORNEYS FOR APPELLEES: | ROBERT W. ATKINSON |
| | MYLES ETHAN SHARP |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED - 10/24/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1. Maria Thompson filed a complaint against Dennis Holliman and Allstate Property and

Casualty Insurance Company ("Allstate") in the County Court of the Second Judicial District

of Harrison County, alleging that Holliman had negligently operated his motor vehicle while

pulling a trailer in a gas-station parking lot, resulting in a collision in which she was injured.

A Harrison County jury returned a verdict in favor of Holliman, and the circuit court entered

a judgment consistent with the jury verdict. Aggrieved, Thompson appealed, alleging that the trial court had abused its discretion by excluding her expert witness.

## FACTS AND PROCEDURAL HISTORY

¶2. On April 7, 2013, Thompson and Holliman were involved in a motor-vehicle collision in the parking lot of a privately owned gas station in Biloxi, Mississippi. Holliman's Chevrolet Silverado and attached trailer collided with Thompson's Nissan Maxima as Holliman was driving through the gas-pump bay and as Thompson was exiting the lot.

¶3. On June 9, 2014, Thompson sued Holliman in the County Court of Harrison County, Mississippi, Second Judicial District, alleging that Holliman negligently drove through the gas-station parking lot. According to Thompson, she sustained serious bodily injuries and sought damages for bills and medical treatment, loss of wages, physical pain and suffering, and mental and emotional distress.

¶4. On March 22, 2016, Thompson filed a supplemental designation of expert witness[1] designating Jason Walton as an accident-reconstruction expert. Attached to the motion were Walton's *curriculum vitae* and expert report, which included a review of the Harrison County Sheriff's Department parking-lot accident report, a photograph taken at the scene of the collision, photographs of both vehicles involved in the collision, Google Earth imagery of the collision area, and deposition testimony of Thompson and Holliman.

---

[1] Thompson originally designated Officer Caleb Mitchell but withdrew that designation after Holliman filed a motion to strike him as an expert witness. She later designated Walton.

¶5.    Holliman filed a motion in limine to strike Walton's expert testimony because his report did not provide calculations or data supporting his opinions. On June 9, 2016, the trial court entered an order granting Holliman's motion to strike. The trial court stated that an opinion of an expert "must be based on some scientific data with certain principals and methodology . . . . [and] the facts of the case at hand." The court found that Walton's use of a "typical" vehicle standard was inadequate. The court concluded that Walton's report was not "the product of reliable principles and methods"; he was in "no better position than the trier of fact to conclude whether [Holliman's] actions were negligent"; and his opinion would not be helpful to the jury.

¶6.    Thompson redesignated Walton and provided the court with an amended expert report. In this amended report, Walton measured the average speed of vehicles at the collision site. Holliman again filed another motion to strike Walton's testimony. On October 7, 2016, the trial court held a hearing on the matter and entered an order granting Holliman's motion to strike. In a trial held on October 19 and 20, 2016, a jury found in Holliman's favor.

¶7.    Thompson appealed the decision to the Circuit Court of the Second Judicial District of Harrison County to review the trial court's exclusion of Walton's testimony. On July 27, 2018, the circuit court entered an order affirming the judgment of the trial court. In the order, the court stated that, "[w]ithout a set of protocols [for driving in a parking lot], an opinion as to fault or negligence would not have basis."

¶8.    Additionally, the court held that Walton's methodology of "observing the speed of . . . . vehicles [in the] gas pump bays and calculating an average speed fails to . . . give consideration to the tow load of Holliman's truck [and those used in the experiment], . . .

3

compare the tested vehicles with the vehicles of the parties, . . . and adequately describe the conditions of the parking lot." The court also found no evidence that "Walton's methodology was generally accepted in the field of accident reconstruction."

¶9. On August 23, 2018, Thompson filed a notice of appeal to this Court. This Court finds that the trial court did not err by excluding Walton as an expert witness.

## DISCUSSION

### I.    Standard of Review

¶10. The standard of review for the admission or exclusion of evidence, such as expert testimony, is abuse of discretion. *Inv'r Res. Servs., Inc. v. Cato*, 15 So. 3d 412, 416 (Miss. 2009) (citing *Adcock v. Miss. Transp. Comm'n*, 981 So. 2d 942, 946 (Miss. 2008)).

### II.    Whether the trial court abused its discretion by excluding Thompson's expert witness.

¶11. Mississippi Rule of Evidence 702 states,

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)    the testimony is based on sufficient facts or data;

(c)    the testimony is the product of reliable principles and methods; and

(d)    the expert has reliably applied the principles and methods to the facts of the case.

M.R.E. 702.

4

¶12. "The trial court is vested with a 'gatekeeping responsibility.'" ***Miss. Transp. Comm'n v. McLemore***, 863 So. 2d 31, 36 (Miss. 2003) (quoting ***Daubert v. Merrell Dow Pharm., Inc.***, 509 U.S. 579, 588-89, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)). "The trial court must make a 'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning and methodology properly can be applied to the facts in issue.'" ***Id.*** (quoting ***Daubert***, 509 U.S. at 592-93). "This rule makes it necessary for a trial court to apply a two-pronged inquiry when evaluating the admissibility of expert testimony: (1) is the witness qualified, and (2) is the testimony relevant and reliable?" ***McKee v. Bowers Window & Door Co.***, 64 So. 3d 926, 932 (Miss. 2011) (internal quotation marks omitted) (quoting ***Watts v. Radiator Specialty Co.***, 990 So. 2d 143, 146 (Miss. 2008)).

¶13. Walton concluded that Holliman's actions had been the sole proximate cause of the collision. Specifically, Walton stated that Holliman failed to yield to oncoming traffic and failed to maintain a proper lookout in a situation that would require a heightened level of awareness. Holliman stated that he did not see Thompson until just before impact. Thompson stated that she saw Holliman and thought he was pulling into the gas-pump bay and not exiting the parking lot. Walton opined that had Holliman stopped at the bay and then moved forward, Thompson would have been aware that Holliman was exiting the parking lot.

¶14. We find that Walton was qualified to testify in the field of accident reconstruction. "Mississippi recognizes and allows the use of accident reconstruction experts at trial." ***Poirrier v. Degrande***, 604 So. 2d 268, 270 (Miss. 1992) (citing ***Miller ex rel. Miller v. Stiglet, Inc.***, 523 So. 2d 55, 60 (Miss. 1998)). "Mississippi Rule of Evidence 702 . . .

5

indicates that a witness may be qualified as an expert by knowledge, skill, experience, training, or education." *Miller*, 523 So. 2d at 59.

¶15. According to Walton's *curriculum vitae*, he has served as a state trooper for the Mississippi Department of Public Safety for ten years. He is trained and certified in the field of accident reconstruction by the Mississippi Highway Patrol. He has investigated more than nine hundred collisions and has peer reviewed at least two thousand accident reports submitted for district approval over a three-year period. Specifically, Walton has received training on human factors in traffic-crash reconstruction, forensic mapping, technical-accident investigation, vehicle-acceleration rates, pedestrian walking speeds, and GPS data analysis of commercial vehicle-braking events. Holliman concedes that Walton's qualifications are not in question, and we agree.

¶16. Next, for expert testimony to be admissible, it must be both relevant and reliable. *Daubert*, 509 U.S. at 592–94.

> In *Hollingsworth v. Bovaird Supply Co.*, 465 So. 2d 311, 315 (Miss. 1985), this Court first held that a properly qualified and examined expert witness could provide testimony on issues of ultimate fact regarding the cause of car wrecks without invading the jury's province-essentially placing accident reconstructionist experts on equal footing with other experts. Under *Daubert*, however, [Walton's] testimony must still be both relevant and reliable. *Daubert*, 509 U.S. at 591-[9]2.

*Denham v. Holmes ex rel. Holmes*, 60 So. 3d 773, 785 (Miss. 2011).

¶17. The trial judge struck Walton's first report because he found that "whatever opinion he hopes to give has got to be based upon this case and it's replete with a typical driver." Holliman maintains that Walton's second report, in which he had substituted the "typical" language with estimations, still did not meet the requisite criteria for admissibility under

6

*Daubert*. Comparing the two opinions, Holliman argues that "it is clear that the observation and resulting calculations of average speed were not the basis for his opinion as to the fault for the accident and, as such, his opinion was not based in any scientific procedure." In *Daubert*, the Supreme Court ruled that a trial judge, when faced with a proffer of expert scientific testimony, must determine at the outset whether the expert is proposing to testify to scientific knowledge that will assist the trier of fact to understand or determine the fact in issue. *Daubert*, 509 U.S. at 592.

> As with all evidence, expert testimony must be relevant. M.R.E. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." M.R.E. 401. "The threshold for admissibility is not great, keeping in mind the fact that Rule 401 favors the admission of evidence when it has probative value." *Utz* [*v. Running & Rolling Trucking, Inc.*], 32 So. 3d [450,] 457 [(Miss. 2010)] (citing *Investor Res. Servs., Inc. v. Cato*, 15 So. 3d 412, 417 (Miss. 2009)). Thus, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 595, 113 S. Ct. 2786.

*Hyundai Motor Am. v. Applewhite*, 53 So. 3d 749, 754 (Miss. 2011).

¶18. This Court recognizes that "accident reconstruction cases are recognized as a type of subject matter in which expert opinion would be of assistance to the trier of fact." *Miller*, 523 So. 2d at 60. While relevance is not at issue, the testimony must also be reliable.

¶19. Holliman argued that Walton failed to identify the foundation for his opinion or to base that opinion on any specific facts or data.

> The Court in *Daubert* adopted a non-exhaustive, illustrative list of reliability factors for determining the admissibility of expert witness testimony. [*Daubert*, 509 U.S.] at 592–94. The focus of this analysis "must be solely on principles and methodology, not on the conclusions they generate." *Id.* at 595, 113 S. Ct. 2786. These factors include whether the theory or technique can be and has

7

been tested; whether it has been subjected to peer review and publication; whether, in respect to a particular technique, there is a high known or potential rate of error; whether there are standards controlling the technique's operation; and whether the theory or technique enjoys general acceptance within a relevant scientific community. *Id.* at 592–94, 113 S. Ct. 2786. The applicability of these factors depends on the nature of the issue, the expert's particular expertise, and the subject of the testimony. *Kumho Tire* [*Co. v. Carmichael*], 526 U.S. [137,] 151, 119 S. Ct. 1167[, 143 L. Ed. 2d 238 (1999)]. The *Daubert* Court emphasized that the reliability inquiry contemplated by Rule 702 "is a flexible one." *Daubert*, 509 U.S. at 594, 113 S. Ct. 2786.

*McLemore*, 863 So. 2d at 36-37.

¶20. "Thus, the trial court has 'considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.'" *Id.* at 37 (quoting *Kumho Tire*, 526 U.S. at 152).

¶21. Because the application of *Daubert* is fact specific, a review of Walton's trial testimony is necessary for our analysis. First, Walton acknowledged that there are no designated lanes of travel or protocol for maneuvering a vehicle in a privately owned gas-station parking lot. Walton asserted that, without guidelines, one must use the reasonable-person standard. Walton stated that Holliman should have taken extra care and made sure that approaching drivers were aware of his intentions to safely maneuver his vehicle. According to Holliman's deposition, he intended to pull through the gas-pump bay and park in a location that would accommodate his vehicle and trailer. Walton stated that only Holliman knew this intention and that Holliman had pulled into cross traffic of the parking lot.

¶22. Only after the court rejected Walton's first report did Walton go to the collision site and support his initial conclusion. He sampled vehicles and determined the average speed of vehicles entering or leaving the parking lot in the same routes both vehicles had traveled on

8

the day of the collision.[2] He found that the average speed of a vehicle traveling Thompson's route was 11.05 miles per hour. He then determined that the average speed of a vehicle with a trailer traveling the same route was 8.02 miles per hour. Walton stated that it would have taken Holliman approximately 2.98 seconds to come to a complete stop once his brakes were applied.

¶23. From these calculations, Walton concluded that if Holliman had maintained a proper lookout, he would have traveled approximately 9.62 feet from the time that he perceived a hazard and began to react—a total stopping distance of 12.06 feet. Holliman stated in his deposition that he was driving very slowly; therefore, Walton further concluded that he would have needed even less time to react if he had been traveling below the average speed in a parking lot.

¶24. The Court has clearly articulated "that expert opinions must be based on sufficient facts and data—not illusions—and must apply reliable principles and methods." *Ballard Realty Co. v. Ohazurike*, 97 So. 3d 52, 60-61 (Miss. 2012). "[S]elf proclaimed accuracy by an expert [is] an insufficient measure of reliability." *McLemore*, 863 So. 2d at 38 (citing *Kumho Tire*, 526 U.S. at 157).

¶25. The trial judge asked Thompson's counsel to provide proof that Walton's observations and resulting calculations were based on an accurate, accepted methodology in the field of accident reconstruction. Thompson stated that Walton's technical calculations were based

---

[2] Walton's opinion did not state the difference among the sampled vehicles, it did not describe the parking lot, weather, or lighting conditions at the time of his observation, nor did it consider how those factors compared to the conditions at the time of the accident.

on his specialized education and experience. The judge then asked, "But what as a matter of law says his client had the right of way when there's no law in the parking lot?" Thompson argued that liability was based on a reasonably prudent person. He explained what accident-reconstruction experts are permitted to testify about, but he could not state a specific rule of law governing who had the right of way. No such rule exists in a privately owned gas-station parking lot.

¶26.   Thompson contends that "there is not some sort of required magical set of mathematical calculations that needs to be done. . . [t]his time, distance, and perception, which I think Mr. Walton provided in an affidavit basing his opinion on, is a large portion of accident reconstruction." When Walton opined about estimations for non-party drivers, the trial judge asked if there was a law in the scientific community that would allow an accident reconstructionist to rely on estimations to determine the speed of the drivers, and Thompson did not know.

¶27.   This Court finds that accident-reconstruction experts are permitted to give their opinions on "how an accident happened, the point of impact, the angle of travel, the responsibility of the parties involved or the interpretation of photographs"; however, the trial judge has the discretion to determine the admissibility and reliability of that expert witness testimony. *Hollingsworth*, 465 So. 2d at 314. Here, the trial court appropriately found that Walton's expert testimony was unreliable.

¶28.   In *Denham*, the plaintiff was involved in a collision with the defendant when she was attempting to turn into a parking lot from the highway. *Denham*, 60 So. 3d at 776. Both she and her passenger testified that there was no visible oncoming traffic when she executed the

10

turn. *Id.* at 776-77. The defendant testified that he was driving approximately forty to forty-five miles per hour when plaintiff turned in front of him. *Id.* at 777-78. He stated that he applied the brakes and steered to the right in order to avoid hitting plaintiff's car. *Id.*

¶29. Plaintiff designated Donald Rawson, a traffic-collision reconstructionist, as an expert witness. *Id.* at 777. Rawson was excluded after the court found that he did not reconstruct the accident; "he extrapolated some information from a police report and photographs" and "the testimony [was] not a product of reliable mathematical calculations." *Id.* at 778-79. This Court held that the testimony on the timing and distance estimates was reliable but that Rawson's fault conclusion, which was based on the absence of skid marks, was unreliable. *Id.*

¶30. Rawson used the defendant's admitted speed to calculate the distance between the two vehicles, which was sufficient, but his other testimony did not explain "under the limited physical evidence why skid marks were required for a finding that Holmes had attempted to avoid the accident." *Id.* at 787. "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* at 788 (internal quotation mark omitted) (quoting *Watts*, 990 So. 2d at 149).

> While this Court has allowed . . . an accident reconstructionist to opine as to ultimate conclusions regarding causation, Rawson's ultimate conclusion as articulated in his deposition testimony, based on the lack of skid marks, contained an obvious "analytical gap." Therefore, we cannot say that the trial judge abused his discretion in excluding this testimony. . . . Rawson failed to connect the dots between the skid marks and the existing physical evidence; thus, as found by the trial judge, his conclusion regarding causation was unreliable.

*Denham*, 60 So. 3d at 788.

11

¶31. Similarly, this Court finds that without laws governing private gas-station parking lots and without the parties' estimated speeds, Walton cannot connect the dots between any factual basis and a finding of fault. But the differences in the timing estimates between this case and *Denham* are far too great for this Court to rule that the trial judge abused his discretion by excluding Walton as an expert witness. The trial judge, as gatekeeper, found the basis for the calculations unreliable, and that finding was not arbitrary or clearly erroneous. Accordingly, we affirm.

## CONCLUSION

¶32. Although Walton was qualified and his testimony was relevant, the judge, as gatekeeper, did not find his testimony sufficiently reliable. We agree. Finding no abuse of discretion, we affirm.

¶33. **AFFIRMED.**

**RANDOLPH, C.J., COLEMAN, MAXWELL, CHAMBERLIN AND ISHEE, JJ., CONCUR. KITCHENS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J., AND GRIFFIS, J.**

**KITCHENS, PRESIDING JUSTICE, DISSENTING:**

¶34. I respectfully dissent. The trial court abused its discretion in striking the plaintiff's accident-reconstruction expert, whose findings and opinion would have been helpful to assist the fact-finder.

¶35. This case involves an automobile collision on private commercial property. Dennis Holliman, while driving a Chevrolet Silverado pickup truck, trailer in tow, collided with Maria Thompson's passenger car in a private gas station parking lot. Thompson was driving in the parking lot in her Nissan Maxima in a direction perpendicular to the path of

12

Holliman's approaching truck. In a "T-bone" collision, the front of Holliman's truck struck Thompson's four-door car on its right side. Thompson sustained injuries from the accident and filed a lawsuit against Holliman in the County Court of Harrison County, Second Judicial District. She alleged that Holliman's negligence—namely, his failure to maintain control of his vehicle and his failure to keep a proper lookout—caused the collision.

¶36. Thompson designated Jason Walton to testify as an expert in accident reconstruction. Walton investigated the collision, reviewed relevant documents, and reported his findings. Walton's findings were based on

> [a] review of the Harrison County Sheriff's Department parking lot accident report; [a] review of a photograph taken at the scene of the collision; [a] review of photographs taken of both vehicles involved in the collision; [a] review of Google Earth imagery on the collision area; [s]worn deposition testimony of Maria Thompson; [s]worn deposition testimony of Dennis Holliman; and [c]ommonly accepted methodology in the field of [a]ccident [r]econstruction.

¶37. Walton found that, considering "the lack of a set protocol on how to maneuver in a parking lot such as this, simple [respect of] right[s] of way and maintaining a proper lookout [are] used to prevent a collision." The expert opined that, "[b]ased on the information made available . . . it is [my] opinion . . . within a reasonable degree of certainty that the sole proximate cause of this collision was due to the actions of the driver of the Holliman Chevrolet." Holliman filed a motion *in limine* to strike Walton as an expert witness. After the county court granted Holliman's first motion *in limine*, Thompson redesignated Walton as an accident-reconstruction expert.

13

¶38. Walton reported a more extensive investigation following his redesignation; he visited the gas station parking lot in order to reconstruct the collision by analyzing motorist activity at and near the accident site. Walton calculated average speeds and stopping times of various vehicles he observed at the gas station and evaluated that data, which supported his findings and his conclusion that Holliman's careless conduct had caused the accident. Walton's written report said that

> [t]he average speed of a passenger vehicle calculated from a data sample of twenty vehicles resulted in an average speed of 11.05 miles per hour of a vehicle entering or leaving the parking lot in the same route as the driver of the Thompson Nissan. The average speed of a passenger vehicle pulling a trailer was calculated using a data sample of ten vehicles pulling trailers and resulted in an average speed of 8.2 miles per hour maneuvering though the gas pump bays of the location of impact.

¶39. Walton's report found that, "[o]nce the Thompson Nissan [] passed the Holliman Chevrolet, the Holliman Chevrolet began to [re-enter] the ingress/egress area of the parking lot without maintaining a proper lookout and collided with the Thompson Nissan." Based on this determination, and with his vehicle calculation of an "an average speed of 8.2 mile[s] per hour," Walton opined that "it would have taken the Holliman Chevrolet approximately 2.98 [seconds] to come to a complete stop once the brakes were applied." Walton adduced that if Holliman had been attentive, this stopping distance would have enabled Holliman to avoid oncoming vehicles. He further suggested that "[i]f the very slow speed of the Holliman Chevrolet as stated by the driver in depositions was slower than the tested average speed for this vehicle configuration, then the distance needed to react to a hazard and come to a complete stop would be even less than previously mentioned."

14

¶40. Accordingly, Walton's evaluation, "[b]ased on the information made available," concluded that, "within a reasonable degree [of] certainty[,] . . . the sole proximate cause of this collision was due to the actions of the driver of the Holliman Chevrolet." Thompson filed another motion *in limine* to strike Walton as an expert. The county court granted the motion,[3] and the case was tried without Walton's testimony. On appeal to the circuit court, Thompson argued that the county court's strike of Walton's expert testimony was erroneous.

¶41. In upholding the county court's exclusion of Walton, the circuit court reasoned that Walton's methods and findings were unreliable.[4] According to the circuit court, because a private gas station parking lot is assumed to be "[w]ithout a set of protocols, an opinion as to fault or negligence would have [no] basis." The circuit court provided no authority for this position, and gave no consideration or credence to Mississippi's common law as it applies to motor vehicles operating on private property. The circuit court held that Walton's findings did not effectively identify or compare the studied vehicles with the parties' vehicles or "adequately describe the condition of the parking lot . . . and [whether the condition] was consistent with the conditions at the time of the accident." Further, it found that Walton's findings did not provide sufficient evidence "that [his] methodology was generally accepted

---

[3]The county court found that "Walton's report is replete with what a 'typical' vehicle traveling perpendicular to a gas pump would do and what a 'typical' driver traveling through the parking lot would assume." The court held that the report was not "the product of reliable principles and methods, and . . . is [un]helpful to the jury[,] [and] further . . . Walton, based upon his report, is in no better position than the trier of fact to conclude whether the Defendant's actions were negligent."

[4]As the majority notes, Walton's qualifications were not at issue, nor was the relevancy of his findings. Maj. Op. ¶¶ 15, 18.

15

in the field of accident reconstruction, either through publications, peer review or otherwise."

With respect, I disagree with the majority's endorsement of this reasoning.

¶42. The assertion that there are no protocols for driving in a parking lot ignores considerable Mississippi case law on this subject. While Mississippi's Traffic Regulations and Rules of the Road[5] may not apply to motorists when they are driving in places other than the state's public streets, roads, and highways, this Court and other courts have defined the duties required of them when they drive on privately owned property. *See, e.g.*, ***Vaughan v. Lewis***, 236 Miss. 792, 112 So. 2d 247, 249 (1959) ("[S]tatutes obviously have no legal application, as such, so far as the regulation of traffic on private property is concerned."); As this Court held in ***Fowler Butane Gas Co. v. Varner***, "common law applies in the absence of statutory authority and requires the operator of a motor vehicle to exercise ordinary, reasonable or due care toward others."[6] ***Fowler Butane Gas Co. v. Varner***, 244 Miss. 130, 141 So. 2d 226, 230 (1962) (citing ***Hadad v. Lockeby***, 176 Miss. 660, 169 So. 691 (1936)). *See also **Hickman v. Jordan***, 87 S.W.3d 496, 499 (Tenn. Ct. App. 2001) ("[T]he duties and liabilities of drivers are governed by the basic principles of common law negligence requiring each person to exercise ordinary and reasonable care under the circumstances. . . . Conditions such as those found in a crowded parking lot may require a driver to use an even greater

---

[5]*See* Miss. Code Ann. §§ 63-3-1 to -1215 (Rev. 2015).

[6]For instance, while there may be no statutory law prohibiting such an act, it would "be imprudent to back an automobile out of a garage across the sidewalk without taking extra precautions to avoid running down [a] passersby. Especially where the view is obstructed is it necessary to take extra precautions." *Varner*, 141 So. 2d at 231 (internal quotation marks omitted) (quoting 5 Am. Jur. *Automobiles*, § 332).

degree of care." (citing ***Miller v. Berry***, 457 S.W.2d 859, 862-63 (Tenn Ct. App. 1970))).

And among the first principles of prudent vehicle operation are that "an automobile driver has a duty 'to keep a reasonable lookout' and 'take reasonably proper steps to avoid an accident or injury to persons and property after having knowledge of [a] danger.'" ***Prewitt v. Vance***, 16 So. 3d 37, 40 (Miss. Ct. App. 2009) (quoting ***Shideler v. Taylor***, 292 So. 2d 155, 156-57 (Miss. 1974)); ***Coleman v. Lehman***, 649 F. Supp. 363, 366 (N.D. Miss. 1986) (in a parking lot case, a Mississippi federal court observed that "the defendant had a duty to maintain a reasonable lookout while he was driving the car for persons such as the plaintiff who might appear in the line to be traversed." (citing ***Thompson v. Riverside Chem. Co.***, 416 F. Supp. 35, 38 (N.D. Miss. 1976))). Undoubtedly, it does not require a traffic signal to "easily conclude that a driver should anticipate and expect other vehicles to approach from either the front or the side within a parking lot," or that "a reasonable driver could be easily expected to slow his vehicle when approaching an intersection, especially one with a large parking lot where other cars are expected to be in motion at practically all times." ***Busick v. St. John***, 856 So. 2d 304, 322 (Miss. 2003).

¶43. Thompson's expert reasonably assessed and applied these driving protocols. Walton made findings respecting whether the defendant "maintain[ed] a proper lookout . . . to prevent a collision." Walton advanced an additional standard—whether the defendant kept a "simple right of way"—based upon an observable flow of traffic in the gas station parking lot, and he examined whether a driver prudently acknowledging this movement could avoid

17

colliding with another vehicle.[7] This is the sort of conduct required of reasonable drivers exercising ordinary care, regardless of a public or private setting; and, contrary to the circuit court's findings, these duties, defined in our common law, may serve as the basis for an expert's opinion about whether they were observed or breached. *See **Busick***, 856 So. 2d at 318 ("A reasonable person would recognize the need to slow her vehicle upon approaching an intersection in a busy . . . parking lot[,] [and] is expected to maintain control over her speed and be aware of and expect to meet other vehicles in front of or approaching the sides of her vehicle in the . . . parking lot and in the vicinity of the parking lot.").

¶44.    Applying these standards, Walton endeavored to reconstruct for the fact-finder the relevant circumstances of this accident. He evaluated an average speed of vehicles and an

---

[7]Walton also noted that areas immediately adjacent to gas station pumps would not be recognized by prudent drivers as unrestricted traffic lanes. For instance, the expert opined that

> [v]ehicles traveling perpendicular to the gas pumps are given the right of way so that other vehicles may enter or exit the gas pump bays. If a vehicle in a gas-station parking lot is parallel to a gas pump bay and is driving forward toward that bay, a driver traveling through the parking lot would be presented with a vehicle that is entering the gas pump bay and does not pose an immediate hazard. Such a driver cannot tell what the intention is of the other driver entering the bay. . . .

> The driver of the Holliman Chevrolet had the intention as stated in his deposition to pull through the gas pump bay and park in a location that would accommodate his vehicle and the trailer he was pulling. Only the driver of the Holliman Chevrolet knew this intention, and knowing this intention, the driver knew that he was pulling into "cross traffic" of vehicles pulling to the front of the store. The driver of the Holliman Chevrolet stated that he did not see the Thompson Nissan until a split second before impact, however, his intentions were to pull into a "cross traffic" area in a parking lot that he stated in his deposition was pretty busy.

18

average distance required to appreciate a hazard and come to a complete stop. Walton stated that he performed his examination under circumstances customarily existing at the accident site. With this methodology, Walton employed information and materials that provided insight into the conditions of the parking lot at the time of the accident (i.e., photographs, party depositions, and aerial imagery) to apply his findings to the accident in question. In his second report, Walton reasoned that if "[t]he Holliman Chevrolet driver . . . was paying attention to his surrounding[s, the driver] would have traveled approximately 9.62 feet from the time that he perceived a hazard and [would have begun] to react, which is a total distance to stop of 12.6 feet." Applying this calculated distance to avoid another vehicle, Walton opined that "[o]nce the Holliman Chevrolet entered the pump bay based on the location of impact he had plenty of distance and time to check for oncoming vehicles and stop if necessary before reentering the ingress/egress area of the parking lot." Accordingly, Walton concluded that Holliman had, under the circumstances, "failed to yield to oncoming traffic and failed to maintain a proper lookout." While eyewitness testimony and other evidence might lead jurors to this same conclusion, the jury here was deprived of the expert verification that Walton would have provided. His expert opinion would have corroborated the plaintiff's version of what happened, strengthening her case. The trial court's total elimination of Thompson's expert deprived her of the chance to accomplish that.

¶45. Because Walton was prevented from testifying about these findings, I would hold that the county court abused its discretion in failing to respect "[t]he basic threshold for admitting an expert's opinion," namely, "whether the testimony is 'based on scientific knowledge

19

which would assist the trier of fact to understand or determine a fact at issue.'" ***Miss. Dep't of Mental Health v. Hall***, 936 So. 2d 917, 928 (Miss. 2006) (quoting ***Poole v. Avara***, 908 So. 2d 716, 724 (Miss. 2005)). Walton's testimony would have assisted the jury in understanding how either motorist could have operated his or her vehicle in a way that would have avoided this collision. Our trial courts are empowered to receive such expert testimony to assist in explaining the often-complicated nature of automobile collisions. Walton should have been allowed to present his findings for that purpose. *See* ***Fielder v. Magnolia Beverage Co.***, 757 So. 2d 925, 937-38 (Miss. 1999) ("This Court has permitted the testimony of qualified accident reconstruction experts to give opinions on how an accident happened, the point of impact, the angle of travel, the responsibility of the parties involved, and the interpretation of photographs." (citing ***Miller v. Stiglet, Inc.***, 523 So. 2d 55 (Miss. 1988); ***Hollingsworth v. Bovaird Supply Co.***, 465 So. 2d 311 (Miss. 1985))). *See also* ***Hagan Storm Fence Co. v. Edwards***, 245 Miss. 487, 148 So. 2d 693, 696 (1963) (Jones, J., dissenting) ("The average man has little practical experience in investigating accidents, and testing and familiarizing himself with the various aspects of automobile accidents."), *overruled on other grounds by* ***Hollingsworth***, 465 So. 2d 311. Walton's knowledge and understanding of motor-vehicle collisions placed him a category apart from the average man, as conceded implicitly by Holliman, who did not question his qualifications.

¶46.    Walton did not conduct a complex scientific analysis or perform complicated calculations; but, contrary to Holliman's argument, his findings were far beyond mere "conjecture." ***Sanders v. Wiseman***, 29 So. 3d 138, 141 (Miss. Ct. App. 2010) ("The facts

upon which the expert bases his opinion or conclusion must permit reasonably accurate conclusions as distinguished from mere guess or conjecture." (internal quotation marks omitted) (quoting *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 35 (Miss. 2003))). Walton acquired data regarding the typical operation of vehicles at and around the precise location of the accident he was investigating, and under substantially similar conditions. He prepared his opinion with observations based upon "[c]ommonly accepted methodology in the field of [a]ccident [r]econstruction[,] specifically[,] time[-]distance formulas, measurement from the location of the collision, and average vehicle speed tests." He linked his findings to the facts of the case, and he was qualified and prepared to provide an explanation of his methods and his opinions to the fact-finder. Such evidence was admissible under our precedent and our rules and its weight and worth were well within the jury's province to consider. *See Inv'r Res. Servs., Inc. v. Cato*, 15 So. 3d 412, 423 (Miss. 2009) ("Generally, questions related to the bases and sources of an expert's opinion affect the weight to be afforded the opinion by the jury, not the admissibility of the opinion." (internal quotation marks omitted) (quoting *Funderburk v. Johnson*, 935 So. 2d 1084, 1107-08 (Miss. Ct. App. 2006))). Walton's findings of fact and his methodology are subject to scrutiny, and it is within the prerogatives of the defense to question and challenge during cross-examination; moreover, Holliman was free to bring forth his own "properly qualified and examined expert witness [to] provide . . . testimony [that] is potentially helpful in deciding those issues of ultimate fact." *Hollingsworth*, 465 So. 2d at 315.

21

¶47. As Thompson acknowledged, neither Walton nor anyone else could have acquired 100 percent of the information required to create an unassailable reconstruction of a private parking lot accident;[8] but this should not preclude a good-faith effort by an expert, whose credentials were not questioned, to obtain as much relevant information as possible. In fact, this provides an illustrative example of why a motor vehicle accident expert was necessary in this case. As suggested above, because the average man or woman cannot be expected to have sufficient sophistication or experience to reconstruct an automobile accident, a plaintiff has limited means with which to provide such information and assistance without the aid of an expert. Because a private parking lot accident does occur in the absence of codified driving protocols, an accident-reconstruction expert is all the more necessary to explain for the finders of fact what a motorist should have expected of other motorists while driving in an environment governed by no *statutory* protocols.[9] The trial court—if it had concerns about

---

[8]Thompson contended on appeal that Walton's reconstruction "cannot get more case-specific without Walton witnessing the actual wreck or obtaining a 'black box' immediately after the collision."

[9]Considering the ambiguity regarding the applicable standards for an expert analysis of a private parking lot accident, this arguably is a comparatively untested aspect of accident reconstruction. *See Gray v. State*, 202 So. 3d 243, 257 (Miss. Ct. App. 2015) ("*Daubert* does not state that expert testimony is per se inadmissible if the substance of the testimony has never been the subject of peer review." (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151, 119 S. Ct. 1167, 1175, 143 L. Ed. 2d 238 (1999))). But through the same analysis, Walton averred also that he founded his findings on "commonly accepted methodology in the field of [a]ccident [r]econstruction[,] specifically time[-]distance formulas, measurement from the location of the collision, and average vehicle speed tests." *See Hyundai Motor Am. v. Applewhite*, 53 So. 3d 749, 753-54 (Miss. 2011) (Mississippi courts utilize the *Daubert* standards to determine the reliability of an expert witness's testimony, namely "(1) whether the expert's theory can be or has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and control; and (5) the degree

the reliability of certain of Walton's methods or findings—could have limited the testimony of this expert; instead, his role was eliminated entirely. The analogy of throwing the baby out with the bath water comes to mind. In the absence of such expertise and left to its own unguided analysis, the jury was deprived of much-needed assistance. While Thompson might have found a more articulate expert, she did succeed in finding an expert whose credentials and expert status were not challenged by the opposing party and were accepted by the trial court. Walton should have been allowed to testify, subject to cross-examination and contemporaneous defense objections, to whatever aspects of his testimony Holliman may have seen fit to challenge.

¶48.    Further, this Court in ***Denham***—in light of the majority's attempts to distinguish Walton's expertise here—*did* allow an accident reconstruction, utilizing "basic mathematics—an obviously reliable methodology—to create his timing and distance estimates," finding that such was relevant and reliable under ***Daubert***. ***Denham v. Holmes ex rel. Holmes***, 60 So. 3d 773, 786 (Miss. 2011). In that case, we found that the circuit court had abused its discretion by excluding an accident-reconstruction expert whose findings were based on the expert's review of certain relevant materials, including the police report, party depositions, and accident photographs, and an evaluation of "[t]iming vehicles at the accident scene . . . ." ***Id.*** at 778. As is the case here,

---

to which the technique or theory has been generally accepted in the scientific community." (quoting ***Hill v. Mills***, 26 So. 3d 322, 330 n.6 (Miss. 2010))). By either means, I would find that Walton's methodology was not so deficient as to have fallen short of the requirements of Rule 702.

[a]lthough jurors could have performed [the expert's] common calculations, [the expert] collected data from the accident using his specialized knowledge. He measured sight distances, timed cars, and determined the location of the accident from the available evidence. He interpreted this evidence and, ultimately, based on this limited evidence, he reached conclusions about causation and avoidance. As applied mathematically and at the accident site, [this] expert analysis and methods regarding timing and distance estimates, were beyond the average juror's "common knowledge" and should have been presented to the jury.

*Id.* at 786-87 (citing ***Palmer v. Biloxi Reg'l Med. Ctr., Inc.***, 564 So.2d 1346, 1355 (Miss. 1990); ***Smith v. Ameristar Casino Vicksburg, Inc.***, 991 So. 2d 1228, 1230 (Miss. Ct. App. 2008)).

¶49.    That is precisely what Walton did in this case. Moreover, as this Court also determined, even if an expert's "timing and distance estimates arguably [are] shaky," the fact-finder is authorized to determine expert witness credibility, provided the witness satisfies the criteria of Rule 702. *Id.* at 786 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." (quoting ***Hubbard ex rel. Hubbard v. McDonald's Corp.***, 41 So. 3d 670, 676 (Miss. 2010))).[10] Thompson cannot be accused of failing to "connect the dots" between fault and fact when he utilized the same methods and

---

[10]The majority's analysis of ***Denham*** focuses on this Court's holding that the trial court did not abuse its discretion in preventing the accident-reconstruction expert from providing an arguably unreliable ultimate conclusion that a motorist was negligent for failing to stop "based on the absence of skid marks" at the accident site. Maj. Op. ¶ 29. But while the Court held that the "trial judge did not err in performing his role as gatekeeper under Mississippi Rule of Evidence 702 and ***Daubert*** regarding Rawson's ultimate conclusions[,]. . . . we [were] constrained to find that the trial judge abused his discretion in disallowing [the expert's] testimony concerning timing and distance estimates." ***Denham***, 60 So. 3d at 789.

24

estimates this Court previously has countenanced merely because this incident occurred in a parking lot. Maj. Op. ¶ 31.

¶50.    Accordingly, I do not find that this expert failed to meet the requirements of our Rules of Evidence. Walton would have provided "testimony regarding his timing and distance estimates, based on common mathematics, [which] constitute[s] expert testimony in the field of accident reconstruction," all based on a studious investigation into the relevant facts of this collision. *Denham*, 60 So. 3d at 786. Because his expert analysis and conclusion would have assisted the jury in making a full and informed decision against the backdrop of Holliman's right to challenge and perhaps discredit Walton's opinions, I would find that the county court abused its discretion by not allowing his testimony, and I would reverse and remand the case for a new trial.

**KING, P.J., AND GRIFFIS, J., JOIN THIS OPINION.**